IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   16-CR-237 (MAD) |
| | ) | |
| **v.** | ) | |
| | ) | **UNITED STATES' TRIAL** |
| | ) | **MEMORANDUM** |
| **ROBERT J. SEIFERT,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## I.   <u>STATEMENT OF THE CASE</u>

On July 28, 2016, a grand jury returned a three-count indictment charging the defendant, Robert J. Seifert ("Seifert"), with two counts of threatening to assault and kill U.S. officials, in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4), and one count of making interstate threats to injure another person, in violation of 18 U.S.C. § 875(c).

Jury selection is scheduled to commence on April 4, 2017, in Albany, New York.  The estimated duration of the trial is approximately three days.

## II.   <u>STATEMENT OF FACTS</u>

At the time of his alleged crimes, Seifert was 58 years old and residing in Canandaigua, New York.

Seifert served a total of 8 months in the United States Army, in 1979.

Seifert periodically receives medical attention and treatment at facilities operated by the U.S. Department of Veterans Affairs ("VA"), including VA hospitals in Albany and Canandaigua.

On June 15, 2016 at about 5:53 p.m., Seifert called the Veterans Crisis Line ("Crisis Line"), located in Canandaigua.  No one at the Crisis Line was available to take Seifert's call, so the call rolled over to a subcontractor, Lines for Life, in Portland, Oregon.  The call was recorded.  The following is a transcription of the call:

Operator: Hi you've reached the Veterans Crisis Line, this is Lisa.

Seifert: Yeah. I got an Uzi and I wanna kill everybody at the Albany VA. And I'm not playing games with you. You, you stupid, fucking bullshit. I'm gonna tell you what. When I get to the Albany VA I'm gonna blow up.

Operator: OK.

Seifert: You understand me?

Operator: Um.

Seifert: Ok.Yeah-

Operator: What's your name?

Seifert: I'm gonna tell you something else, too. No. Cause you don't want to answer the phone. OK.

Operator: I do want to answer the phone. I do want to talk to you.

Seifert: Watch what happens when I get to the Albany VA with my Uzi and I start shooting people up.

Operator: OK. Well you're going to go to the Albany VA with your Uzi? Do you have an Uzi?

Seifert: Know who the fuck this is? My name is Robert Seifert. And I'm-

Operator: Sorry. Your name is Robert?

Seifert: And I'm going to fucking kill everybody there. Bye.

Operator: Robert?

According to Verizon Wireless, the phone number that was used to call the Crisis Line was registered to Seifert as of June 1, 2016.  Verizon Wireless records also show that Seifert's phone was used to place a call to the main telephone number of the Albany Stratton VA Medical Center ("Albany VA") at 5:53 p.m.; from the main line he could reach the Crisis Line.

Several minutes later on June 15, 2016, Sam Mento, a nurse at the Albany VA's psychiatric ward, received a phone call from someone identifying himself as "Seifert."  Mento had treated Seifert about 18 months prior, and he recognized his voice and remembered him.  In the phone call, which was not recorded, Seifert told Mento in sum and substance that "I am trying to get to the VA hospital before I blow" and "if I blow before I get there, I am coming in shooting."

Mento transferred the call to Albany VA Police Officer Stephen Valcik.  Seifert told Valcik in sum and substance that he was coming to the Albany VA and would shoot and kill many people, and that he would make bigger headlines on CNN than the shooting that had just happened – which Valcik took to be a reference to the Orlando, Florida, nightclub shooting, which had happened 3 days prior.  Seifert also specifically threatened to kill Valcik, who at the beginning of the call identified himself as a VA Police Officer.  Valcik wrote down the number Seifert was calling from; it was the same number that Seifert used to call the Crisis Line.  Verizon records show that Seifert made a call to the Albany VA at 5:58 p.m. that is consistent with his call to Mento and Valcik.

Due to Seifert's threats on June 15, the Albany VA immediately went into "Code Black," or lockdown mode, which included setting up a perimeter around the facility, restrictions of movement in and around the facility, greater monitoring of all entrances, and escorts of people to and from the parking lot. The lockdown lasted an hour though the VA Police remained in a heightened state of alert until Seifert was located.

On the evening of June 15, Seifert was found in a park in the city of Amsterdam, New York.  He was sent to St. Mary's hospital in Amsterdam for an evaluation.

New York State Police ("NYSP") investigators responded to St. Mary's on June 16, 2016, to interview Seifert about the threats he had made against the Albany VA.  Seifert told the NYSP investigators that his statements were a cry for help, that he was drunk when he made them, and

that he made them because he felt that the VA was not helping him.  Seifert told investigators that

he was aware of the consequences of making these statements and would not make them again.

In September 2015, Seifert was arrested for calling the Crisis Line and stating that he would

be coming to the VA hospital in Canandaigua to shoot people.  He said he had a gun, that he was

serious, and that people were going to die.  Seifert later told a Special Agent from the VA Office

of Inspector General that he made the threat because he was not being properly treated at the

Canandaigua VA and he was drunk.  Seifert received a 9-month jail sentence after pleading guilty

to aggravated harassment, a misdemeanor, in Canandaigua City Court.

### III.  LAW RELATED TO THE CHARGES IN THIS CASE

### A.  Counts 1 Through 2 – Threats to Kill and Assault U.S. Officials:  18 U.S.C. § 115(a)(1)(B) and (b)(4)

Counts 1 through 2 charge the defendant with threatening to assault and kill U.S. officials,

in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4).  The statute provides:

> Whoever threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime [under section 1114 of this title], with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished … by a fine under this title or imprisonment for a term of not more than 10 years, or both, except that imprisonment for a threatened assault shall not exceed 6 years.

The elements of the offense are:

> First, that the defendant knowingly made a true threat to assault, kidnap, or murder a federal official; and

> Second, that the defendant acted with the intent to impede, intimidate, or interfere with that official while he or she was engaged in the performance of his or her official duties, or with the intent to retaliate against that official on account of the performance of his or her official duties.

4

Sand, et al., Modern Federal Jury Instructions – Criminal, § 14.02, Instruction 14-13 (elements one and two combined and modified to cover scenario in which the defendant threatens to kill and injure multiple federal officials); *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013).

     i.   **First Element**

The government must prove that the threats in question were clear and true threats, and that the defendant knowingly made these threats. *See United States v. Wright-Darrisaw*, 617 Fed. Appx. 107, 108 (2d Cir. 2015) (unpub.) (a true threat is, viewed from the perspective of a reasonable person, a serious expression of an intent to commit an act of unlawful violence, which can be found even if the defendant did not actually intend to commit the act threatened).

Who is a "federal official" protected under § 115(a)(1)(B) is determined in part by reference to § 1114, because § 115(a)(1)(B) says it is a crime to threaten "an official whose killing would be a crime under" § 1114. That section, in turn, criminalizes the killing or attempted killing of "any officer or employee of the United States or of any agency in any branch of the United States Government."

While neither the Supreme Court nor the Second Circuit has spoken to whether any federal employee (e.g. a VA nurse or police officer) is a "federal official" under § 115(a)(1)(B), the Third Circuit has directly addressed that question – which it called a matter of first impression for any circuit – and answered it affirmatively. *See United States v. Bankoff*, 613 F.3d 358, 360 (3d Cir. 2010) (§ 115(a)(1)(B) applies to all federal employees). *See also United States v. Wynn*, 827 F.3d 778, 783-786 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 604 (2016) (VA housekeeping supervisor was a federal employee and, therefore, a protected official under § 115(a)(1)(B)). Two other circuit courts have affirmed convictions where federal employees were threatened, without directly ruling on the issue of whether all employees are covered by the statute. *See United States v. Armel*, 585

F.3d 182, 185 (4th Cir. 2009) (affirming conviction under § 115 for threatening "FBI agents and support staff," including a secretary, at a local FBI office); *United States v. Cash*, 394 F.3d 560, 561 (7th Cir. 2005) (affirming conviction under § 115 for threatening a "[s]ervice [r]epresentative" at a VA office).

A defendant need not threaten a specific federal employee in order to be convicted.  *See Armel*, 585 F.3d at 185 ("[a]lthough Armel did not name potential victims, he did direct his threats to specific persons, namely the FBI agents and support staff at the relatively small Fredericksburg office … We refuse to add a 'particularized victim' element to § 115 when Congress has not done so, and when doing so would result in holding harmless a defendant who threatens to maim or kill several law enforcement officers rather than just one"); *United States v. Nicklas*, 713 F.3d 435, 440 (8th Cir. 2013) (upholding conviction for threat against unspecified FBI agents); *United States v. Abdulkadir*, Case No. 16-CR-2 (KES), 2016 U.S. Dist. LEXIS 20366, *4-5 (D. Minn. Feb. 18, 2016) (unpub.) (declining to dismiss indictment charging defendant with threatening to murder unspecified federal law enforcement officers).

    ii.   **<u>Second Element</u>**

The government must prove that the threats were communicated with the intent to impede, intimidate, or interfere with that official while he or she was engaged in the performance of his or her official duties, or with the intent to retaliate against that official on account of the performance of his or her official duties.  "The statute only requires that the speaker knowingly communicates the threat, and that this threat is made with the intent to impede, intimidate, interfere, or retaliate. *See* 18 U.S.C. § 115(a)(1)(B) … It is not required that [the defendant] intended to, or was even able to, carry out the threat."  *United States v. Stefanik*, 674 F.3d 71, 75-76 (1st Cir. 2012).

B. **Count 3 – Interstate Threats: 18 U.S.C. § 875(c)**

Count 3 charges the defendant with making interstate threats in violation of 18 U.S.C. § 875(c). The statute provides:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

The elements of the offense are:

> First, that the defendant knowingly and intentionally communicated a true threat to kidnap or injure another;

> Second, that the threat communication was transmitted in interstate (or foreign) commerce; and

> Third, that the defendant made the communication for the purpose of issuing a threat, or with the knowledge that the communication would be viewed as a threat.

Sand, et al., Modern Federal Jury Instructions – Criminal, § 31.02, Instruction 31-7 (element one modified to cover scenario in which the defendant threatens to injure multiple people); *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015); *United States v. Choudhry*, 649 Fed. Appx. 60, 62-63 (2d Cir. 2016) (unpub.).

  i. **First Element**

Please see discussion for first element of Counts 1 and 2.

  ii. **Second Element**

While the government must show an interstate communication, it need not prove that Seifert intended to make an interstate communication. *United States v. Kammersell*, 196 F.3d 1137, 1139 (10th Cir. 1999) (federal jurisdiction over threat transmitted by one Utah resident to another Utah resident, where message was routed through AOL's main server in Virginia); *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (defendant convicted of making interstate

threat by calling a 1-800 number that he found in his local phone book: "[w]e reject the Appellant's argument that the Government must establish that he knew his call would be transmitted in interstate commerce"); *United States v. Xiang Li*, 537 F. Supp. 2d 431, 435 (N.D.N.Y 2008), *aff'd*, 381 Fed. Appx. 38 (2d Cir. 2010) ("under 18 U.S.C. § 875(c), the Government need not establish that the defendant knew his communication would be transmitted in interstate commerce"); *see also United States v. Kelner*, 534 F.2d 1020, 1023-1024 (2d Cir. 1976) (defendant communicated a threat in interstate commerce to kill Yasser Arafat, even though both the defendant and Arafat were in New York at the time, because the threat was communicated on a New York-based television program aired in 3 states)

### iii.   **Third Element**

Post-*Elonis*, the government must prove that the defendant made the communication for the purpose of issuing a threat, or with the knowledge that the communication would be viewed as a threat. *Choudhry*, 649 Fed. Appx. at 62-63.

## IV. EVIDENTIARY ISSUES

### A.   **Defendant's Statements**

The United States will seek to admit out-of-court oral statements by the defendant, some of which were audio-recorded. These statements are admissible as party-opponent admissions, pursuant to Federal Rule of Evidence 801(d)(2). *See, e.g., United States v. Meskini*, 319 F.3d 88, 93 (2d Cir. 2003); *United States v. Inserra*, 34 F.3d 83, 93 (2d Cir. 1994).

When the government admits a portion of a defendant's prior statement, the defendant may not put in additional out-of-court statements made by him because such statements are hearsay when offered by defendant. Fed. R. Evid. 801(d)(2); *United States v. Ortega*, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited from eliciting his own exculpatory statements during

cross-examination of government agent); *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) ("[A] defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination").

The "rule of completeness" set forth in Fed. R. Evid. 106 is applicable where one party seeks to introduce a tailored snippet of a statement that creates a misleading impression by being taken out of context. It is entirely proper, however, to admit segments of a statement without including everything, and adverse parties are not entitled to offer additional statements just because they are there and the proponent has not offered them. *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir 1996). Fed. R. Evid. 106 does not render admissible evidence that is otherwise inadmissible under the hearsay rules. *Id.*

### B.     Testimony Concerning the Sum and Substance of Events and Conversations.

Witnesses will be asked to testify concerning their recollection of events and conversations. Testimony concerning the substance of conversations is clearly admissible in accordance with the general rule that "[t]he substance or effect of the actual words spoke will suffice, the witness stating this substance as best he can from the impression left upon his memory." 3 Wigmore on Evidence § 2097 (3d ed. 1940). The witness's inability to provide further detail is then considered by the jury in deciding the weight that such testimony shall be given. *See e.g.*, *United States v. Sovie*, 122 F.3d 122, 128–29 (2d Cir. 1997) (holding that issues of weight are properly left to the jury, while issues of admissibility are to be determined by the court).

Case law shows continued usage of this sensible approach, requiring that the witness relate the "substance or effect" and "context of the statement" as a whole. *See United States v. Castro*, 813 F.2d 571, 576 (2d Cir.), *cert. denied*, 484 U.S. 844 (1987). This rule recognizes that "verbal precision cannot be expected when the source of evidence as to an utterance is the memory of a

9

witness." *Id.*  Accordingly, witnesses at this trial should be allowed to state their best recollection of the substance of events and conversations.

### C.   **Records of Regularly Conducted Activity**

The government will offer records of regularly conducted activity records pursuant to Fed. R. Evid. 803(6).  These records will include records from (a) Lines for Life, the Oregon-based subcontractor that recorded one of Siefert's threatening phone calls; (b) Verizon Wireless, Seifert's phone carrier; and (c) the VA.  In the event the parties cannot stipulate regarding the authenticity of these documents, the Government intends to rely on Fed. R. Evid. 902(11) ("Certified Domestic Records of Regularly Conducted Activity").

### D.   **Authentication**

Federal Rule of Evidence 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Rule 901(a) requires only that the government to make a *prima facie* showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification."  *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir. 1991).  In order to authenticate evidence, "all that is ultimately required is 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'"  *United States v. Simpson*, 152 F.3d 1241, 1250 (10th Cir. 1998) (quoting Fed. R. Evid. 910(a)); *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012).

### E.   **Voluntary Intoxication**

It is anticipated that the defendant will claim at trial that he was too intoxicated to have the *mens rea* required for the offenses with which he has been charged.  "Intoxication or drunkenness in itself is not a legal defense to a criminal charge. However, intoxication or drunkenness may

negate the existence of the defendant's intent to commit the crime that the government must prove in order to convict."  Modern Federal Jury Instructions-Criminal § 8.03, Instruction 8-3; *see also United States v. Rahman*, 189 F.3d 88, 142-143 (2d Cir. 1999) (approving use of similarly worded instruction). The United States has submitted a proposed jury instruction for the Court's consideration in the event the defendant argues intoxication.

Defendants charged with specific intent crimes should receive an instruction on voluntary intoxication "when there is some foundation in the evidence presented at trial for the conclusion that a defendant was too intoxicated to form the specific intent required to commit the crime." *United States v. Crowley*, 236 F.3d 104, 111 (2d Cir. 2000).  If there is "sufficient evidence to support a finding that [the defendant] was intoxicated to the point where he could not form the requisite intent," then an intoxication instruction "is required."  *United States v. Kenyon*, 481 F.3d 1054, 1070, 1070–71 (8th Cir. 2007).  When the evidence presented is inadequate to support an intoxication instruction, or if the requested instruction "is based on mere speculation," then "an intoxication instruction should not be given."  *United States v. Phelps*, 168 F.3d 1048, 1056 (8th Cir. 1999).  The presented evidence must tend to prove not only that the defendant was intoxicated, but that the defendant was so intoxicated that he could not form the specific intent required by the crime.  *United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987) (denying an intoxication instruction as "[t]here [was] no testimony, from medical experts or otherwise, suggesting that [the defendant] generally lacked the metal capacity to form specific intent.").

## V.  RECIPROCAL DISCOVERY AND AFFIRMATIVE DEFENSES

The government has requested reciprocal discovery from the defense.  To the extent that there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that the defense has not produced, the government

reserves the right to seek to have such materials excluded at trial.  *See United States v. Young*, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of Government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

The defendant has not given notice of his intent to rely on any defense of entrapment, mental incapacity, duress, or alibi.  Therefore, to the extent the defendant may attempt to rely on any such defense, the government reserves the right to object and to seek to have the defendant precluded from asserting such defenses.

## VI.  <u>CONCLUSION</u>

Through this trial memorandum the United States has attempted to summarize those principles of law that it believes to be applicable in resolving issues that the Court may face during trial.  The United States respectfully requests an opportunity to submit additional legal authority in connection with such other issues as may arise.

Dated: March 22, 2017

Respectfully submitted,

RICHARD S. HARTUNIAN
United States Attorney


*/s/ Michael Barnett*
_____

Michael Barnett
Assistant United States Attorney
Bar Roll No. 519140